**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| CHARLES FRANZ, individually and on behalf of all others similarly situated, |
| Plaintiff, |
| v. |
| NATIONAL FOOTBALL LEAGUE., *et al*., |
| Defendants. |

No.: 1:23-cv-11288-ALC

**PLAINTIFF'S CONSOLIDATED OPPOSITION TO**
**DEFENDANTS' MOTIONS TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

FACTUAL ALLEGATIONS ........................................................................................ 4

LEGAL STANDARD.................................................................................................... 9

ARGUMENT ................................................................................................................ 9

    I.      Plaintiff Pleads Defendants Engaged in an Anticompetitive Conspiracy............... 9

           A.      Plaintiff has alleged a group boycott among horizontal competitors, which is *per se* unlawful. ...............................................11

           B.      Plaintiff also states a claim under the rule of reason. ................................13

                  1.      Plaintiff has alleged a multipronged conspiracy to preclude price competition in the relevant market. .....................................14

                  2.      Plaintiff has sufficiently pled the relevant market for this stage in the litigation. ..............................................................16

                  3.      Defendants' conspiracy caused actual detrimental effects on competition. ....................................................................20

                  4.      Plaintiff has standing because he is the efficient enforcer of the antitrust laws as a purchaser. ..........................................21

    II.     The Defenses Raised in Defendants' Motions Fall Flat. .....................................23

           A.      Defendants' conspiracy goes well beyond ordinary licensing, supply, and authorized merchant agreements..........................................24

           B.      Defendants cannot hide their conspiracy within NFLP's so-called "vertical" structure...........................................................27

           C.      *Casey's* is not to the contrary....................................................29

           D.      Defendants' arguments about "presumptively lawful" contract provisions rest on a fundamental error........................................30

    III.    Plaintiff Stated a Monopolization Claim. ..........................................................31

    IV.    There Are No Grounds to Strike Plaintiff's Class Allegations at this Stage. .......35

           A.      The NFL Defendants' request is premature..............................................35

B.    Any modifications to Plaintiff's class definition should be reserved for class certification. ......................................................................................38

CONCLUSION ............................................................................................................... 39

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                 Page(s)

*1-800 Contacts, Inc. v. Fed. Trade Comm'n,*
   1 F.4th 102 (2d Cir. 2021) ........................................................................ 26

*American Needle, Inc. v. National Football League,*
   560 U.S. 183 (2010)................................................................................... 28

*Associated Press v. United States,*
   326 U.S. 1 (1945)....................................................................................... 24

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007)............................................................................. 9, 10

*Berger v. JetBlue Airways Corp.,*
   No. 22-cv-7374, 2024 WL 4107243 (E.D.N.Y. Sept. 6, 2024) ............... 10

*Blue Shield of Virginia v. McCready,*
   457 U.S. 465 (1982)................................................................................... 22

*Bon-Ton Stores, Inc. v. May Dep't Stores Co.,*
   881 F. Supp. 860 (W.D.N.Y. 1994)................................................... 19, 20

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.,*
   441 U.S. 1 (1979)....................................................................................... 26

*Brown Shoe v. U.S.,*
   370 U.S. 294 (1962)................................................................................... 17

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
   429 U.S. 477 (1977)................................................................................... 21

*Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.,*
   996 F.2d 537 (2d Cir. 1993) ..................................................................... 14

*Casey's Distributing, Inc. v. NFL,*
   No. 1:22-CV-03934, 2025 WL 1928544 (S.D.N.Y. July 14, 2025)........................ 3, 23, 29, 30

*Chen-Oster v. Goldman, Sachs & Co.,*
   449 F. Supp. 3d 216 (S.D.N.Y. 2020) ..................................................... 39

*Chenensky v. New York Life Ins. Co.,*
   2011 WL 1795305 (S.D.N.Y. Apr. 27, 2011) ......................................... 35

*Collins v. Pearson Educ., Inc.,*
   721 F. Supp. 3d 274 (S.D.N.Y. 2024) ............................................... 36, 37

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.,*
   370 U.S. 690 (1962).......................................................................... 9, 31, 32

*CSR Ltd. v. Fed. Ins. Co.,*
   40 F. Supp. 2d 559 (D.N.J. 1998) ............................................................ 10

*Davitashvili v. Grubhub Inc.,*
  No. 20-cv-3000, 2022 WL 958051 (S.D.N.Y. Mar. 30, 2022)................................ 11

*Duke Energy Carolinas LLC v. NTE Carolinas II LLC,*
  111 F.4th 337 (4th Cir. 2024) ............................................................................... 31

*Eaton v. Ascent Res.-Utica, LLC,*
  No. 2:19-CV-03412, 2024 WL 1458457 (S.D. Ohio Apr. 4, 2024) ........................ 39

*Enhanced US LLC v. World Aquatics,*
  No. 25-cv-7096, 2025 WL 3206662 (S.D.N.Y. Nov. 17, 2025) ............................. 32

*F.T.C. v. Actavis, Inc.,*
  570 U.S. 136 (2013)................................................................................................ 26

*Faber v. Metro. Life Ins. Co.,*
  648 F.3d 98 (2d Cir. 2011) ..................................................................................... 9

*Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design,*
  244 F.3d 521 (6th Cir.2001) ................................................................................... 19

*Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.,*
  386 F.3d 485 (2d Cir. 2004) ................................................................................... 10

*Goetz v. Ainsworth Pet Nutrition, LLC,*
  768 F. Supp. 3d 645 (S.D.N.Y. 2025) ............................................................. 35, 36

*Heerwagen v. Clear Channel Commc'ns,*
  435 F.3d 219 (2d Cir. 2006) ................................................................................... 32

*Hill v. Xerox Bus. Servs., LLC,*
  59 F.4th 457 (9th Cir. 2023) .................................................................................. 39

*In re Aluminum Warehousing Antitrust Litig.,*
  95 F. Supp. 3d 419 (S.D.N.Y. 2015) ...................................................................... 22

*In re High-Tech Emp. Antitrust Litig.,*
  856 F. Supp. 2d 1103 (N.D. Cal. 2012) ................................................................. 10

*In re Keurig Green Mt. Single-Serve Coffee Antitrust Litig.,*
  383 F. Supp. 3d 187 (S.D.N.Y. 2019) ................................................... 9, 22, 25, 27

*In re Namenda Indirect Purchaser Antitrust Litig.,*
  338 F.R.D. 527 (S.D.N.Y. 2021) ............................................................................ 39

*In re Ry. Indus. Emp. No-Poach Antitrust Litigation,*
  395 F. Supp. 3d 464 (W.D. Pa. 2019)..................................................................... 37

*Int'l Constr. Prods. LLC v. Caterpillar Inc.,*
  419 F. Supp. 3d 791 (D. Del. 2019)........................................................................ 10

*LEGO A/S v. ZURU, Inc.,*
  No. 3:18-cv-2045, 2020 WL 13145135 (D. Conn. Apr. 22, 2020) ........................ 32

*Maldonado v. National Football League,*
  No. 22-cv-02289, 2023 WL 4580417 (S.D.N.Y. July 18, 2023)............................................. 38

*Mayfield v. Asta Funding, Inc.,*
  95 F. Supp. 3d 685 (S.D.N.Y. 2015) ........................................................................... 36, 37

*Mayor & City Council of Baltimore v. Citigroup, Inc.,*
  709 F.3d 129 (2d Cir. 2013) ........................................................................................... 9

*Mooney v. AXA Advisors, L.L.C.,*
  19 F. Supp. 3d 486 (S.D.N.Y. 2014) ............................................................................ 14

*Nat'l Soc. of Pro. Eng'rs v. United States,*
  435 U.S. 679 (1978)...................................................................................................... 10

*NCAA v. Board of Regents of University of Oklahoma,*
  468 U.S. 85 (1984)........................................................................................................ 10

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.,*
  472 U.S. 284 (1985)...................................................................................................... 11

*NYNEX Corp. v. Discon, Inc.,*
  525 U.S. 128 (1998)...................................................................................................... 11

*Ohio v. Am. Express Co.,*
  585 U.S. 529 (2018)...................................................................................................... 20

*P & L Dev., LLC v. Gerber Prods. Co.,*
  715 F. Supp. 3d 435 (E.D.N.Y. 2024) ..................................................................... 19, 33

*Panini Am., Inc. v. Fanatics, Inc.,*
  No. 23-CV-9714, 2025 WL 753954 (S.D.N.Y. Mar. 10, 2025)................................... 26

*Quad Cinema Corp. v. Twentieth Century-Fox Film Corp.,*
  No. 76 CIV 4452, 1983 WL 1822 (S.D.N.Y. May 12, 1983)...................................... 14

*Reading Int'l, Inc. v. Oaktree Cap. Mgmt. LLC,*
  317 F. Supp. 2d 301 (S.D.N.Y. 2003) ................................................................... 11, 25

*Reynolds v. Lifewatch, Inc.,*
  136 F. Supp. 3d 503 (S.D.N.Y. 2015) ......................................................................... 35

*Rothstein v. Auto Club S.,*
  2017 WL 11455316 (S.D.N.Y. Mar. 16, 2017) .......................................................... 36

*Spectrum Sports, Inc. v. McQuillan,*
  506 U.S. 447 (1993)...................................................................................................... 32

*Spinelli v. National Football League,*
  96 F. Supp. 3d 81 (S.D.N.Y. 2015) ............................................................................. 27

*Standard Oil Co. of New Jersey v. United States,*
  221 U.S. 1 (1911).......................................................................................................... 13

*Standard Oil Co. of California v. United States,*
    337 U.S. 293 (1949)...................................................................................... 26

*Sullivan v. Study.com LLC,*
    No. 18-cv-1939, 2019 WL 1299966 (S.D.N.Y. Mar. 21, 2019)........................ 36, 38

*Thomas v. AAM Holding Corp.,*
    No. 1:24-cv-7253, 2025 WL 2617450 (S.D.N.Y. Aug. 26, 2025) ..................... 37

*Todd v. Exxon Corp.,*
    275 F.3d 191 (2d Cir. 2001) ............................................................. 17, 19

*Tops Markets, Inc. v. Quality Markets, Inc.,*
    142 F.3d 90 (2d Cir. 1998) ............................................................ 33

*United States v. Apple, Inc.,*
    791 F.3d 290 (2d Cir. 2015) ........................................................... 28

*United States v. General Motors Corp.,*
    384 U.S. 127 (1966)............................................................... 12, 13

*United States v. Griffith,*
    334 U.S. 100 (1948) ............................................................... 26

*United States v. Socony–Vacuum Oil Co.,*
    310 U.S. 150 (1940)............................................................... 28

*United States v. Visa U.S.A., Inc.,*
    344 F.3d 229 (2d Cir. 2003) ........................................................ 25

**Secondary Sources**

2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* § 310c1 (4th ed. 2014)..................... 31

7 Phillip Areeda, Antitrust Law ¶ 1502, at 371 (1986) .............................................. 14

Drew Magary, "Fanatics has finally pissed off the wrong people,"
    *SFGate* (Feb. 15, 2024),............................................................ 21

Plaintiff Charles Franz ("Plaintiff"), individually and on behalf of all others similarly situated, respectfully submits this memorandum of law in opposition to the motions to dismiss his complaint (ECF 1, "Compl.") filed by the NFL Defendants—the National Football League, NFL Properties LLC ("NFLP"), NFL Enterprises LLC, and each of the NFL's 32 member teams (the "Teams")—and by Defendant Fanatics LLC (collectively, "Defendants").

## INTRODUCTION

Defendants have orchestrated an anticompetitive scheme to restructure the online retail market for NFL Licensed Products for their own benefit. The NFL and the Teams license rights to manufacture merchandise bearing their trademarks to different manufacturers. From there, the merchandise is sold to consumers: either directly by the Teams, by the licensee-manufacturers, or by other retailers. One of these licensee-manufacturers, Fanatics, is the principal subject of this litigation because it has worked hand-in-glove with the NFL (despite ostensibly being a competitor) to acquire an unlawfully dominant market position and eliminate competition. The NFL puts its fingers on the scale because it is a significant investor in Fanatics that benefits from Fanatics' anti-competitive actions.

Plaintiff's Complaint alleges that the NFL Defendants and Fanatics have unlawfully conspired to grant Fanatics a privileged position in the market while driving out competition from retailers who sell NFL Licensed Products on Third-Party Online Marketplaces ("TPOMs"). These marketplaces, such as Amazon Marketplace, serve to facilitate transactions between a customer and many different retailers who use the marketplace's infrastructure to reach more customers. In this way, a TPOM is different from a regular e-commerce platform because the customer is buying from a retailer who does not own or operate the platform they are buying on. To the consumer, it appears that they are shopping at Amazon—or whatever the relevant TPOM—but there are a host

1

of retailers within that platform competing for business. The "farmer's market" nature of TPOMs encourages price competition by allowing the customer their pick of different retailers who are all trying to sell goods alongside one another on a fair playing field.

Unhappy with this price competition, Defendants conspired to rig the game through a web of interlocking agreements. The first set of agreements forbid licensee-manufacturers from distributing NFL Licensed Products to retailers who compete on TPOMs. Compl. ¶ 118. On its own, this explicit group boycott among horizontal competitors—including the NFL Teams, who retail their own merchandise—is a classic antitrust violation that is anticompetitive *per se*. But this policy was made worse by uneven application, as Fanatics was able to openly flout the TPOM restrictions while other retailers were forced to comply or lose their ability to sell NFL Licensed Merchandise.

Second, going beyond the group boycott of retailers who sell on TPOMs, Fanatics exploited its own status as the largest online retailer of NFL Licensed Products to strongarm its suppliers into blacklisting any retailer who primarily sells online (through TPOMs **or** traditional e-commerce platforms). Starving all other online retailers of inventory drives traffic and, ultimately, market power to Fanatics.

Third, to further direct business to Fanatics, the NFL Teams have licensed their own online storefronts to Fanatics. This has meant the Teams, who are supposed to be *competing* with Fanatics as retailers, have instead agreed to turn their retail websites into extensions of Fanatics.com, selling the same products at the same prices and eliminating another vector for price competition.

Fourth, the NFL Defendants have prevented competing retailers from using NFL-related keywords in advertising their products on TPOMs. In the ordinary course of online retail business, sellers would be able to use these keywords as another forum for competition—bidding for

advertising space on Google, or ensuring that they show up in customers' keyword searches on Amazon Marketplace. Instead, Defendants have circumvented that process by decreeing that only the NFL Defendants and Fanatics are authorized to use official keywords.

Overall, this concerted course of conduct has proven immensely profitable for Defendants at the expense of consumers like Plaintiff. Consumers are deprived of meaningful competition because Defendants have conspired to drive everyone *but* Fanatics out of the online retail market for NFL Licensed Products. The result is a Potemkin village of illusory choices: no matter whether a customer goes to the Amazon Marketplace, their NFL team's own website, or even searches for a product on Google, all roads lead back to Fanatics. Fanatics' privileged position lets them charge ever-increasing monopoly prices for lower-quality merchandise, safely insulated from the pesky pressures of a competitive marketplace.

Now, Defendants ask this Court to dismiss the complaint.[1] They do so chiefly through misdirection—repackaging a horizontal group boycott among competing retailers as mere "vertical" licensing decisions, pretending that each component of a unified scheme must be assessed in isolation, and waving around this Court's decision in *Casey's Distributing, Inc. v. NFL*, No. 1:22-CV-03934, 2025 WL 1928544 (S.D.N.Y. July 14, 2025), as if it blessed their entire anticompetitive enterprise. It did no such thing.

*Casey's* dismissed a complaint brought by a *retailer* who alleged it was harmed by being excluded from TPOMs. The Court found that Casey's, as an excluded competitor, had not demonstrated "antitrust injury of the type the antitrust laws were intended to prevent." *Id.* at *4.

---

[1] *See* NFL Defs.' Mot. to Dismiss, Dkt. No. 50 ("NFL Mot."); Fanatics Mot. to Dismiss, Dkt. No. 52 ("Fanatics Mot.").

But the *Casey's* decision could not have precluded claims by direct consumers, like Plaintiff, who have paid inflated prices as a direct result of reduced competition. If Casey's was not correctly situated to bring an antitrust case, Mr. Franz must be. He alleges the quintessential antitrust injury: that he and millions of putative class members paid supracompetitive prices because Defendants eliminated competitors who would have charged less. *See* Compl. ¶¶ 12, 69, 329, 337.

The complaint alleges a horizontal conspiracy among competitors—namely, the NFL, its 32 Teams, and Fanatics, all of whom compete as online retailers of NFL Licensed Products—to boycott other retailers, deny them access to suppliers, and exclude them from the market altogether. That is *per se* illegal. But Plaintiff has also appropriately alleged that the scheme is anticompetitive under the rule of reason, because Defendants' conspiracy has resulted in visibly increased prices and decreased consumer choice. And it is further unlawful still as an unlawful attempt to turn the limited monopoly afforded by a trademark license into complete domination of the entire online market. Plaintiff, as a direct purchaser who paid inflated prices, has precisely the standing to challenge this conduct.

The motions to dismiss should be denied.

## FACTUAL ALLEGATIONS

**The Market.** The online retail market for NFL Licensed Products is structured by a web of licensing agreements. The NFL itself is an association of 32 Teams, each of which is separately owned and operated. Compl. ¶ 15. The NFL and the Teams together created NFLP, which acts on their behalf for licensing the whole universe of NFL-related trademarks and logos. *Id.* ¶ 16. NFLP signs licensing agreements with licensees, who manufacture Licensed NFL Products for distribution to retailers and sale to consumers.

For purposes of this case, Fanatics is a vertically integrated licensee that "manufactures, distributes, and retails NFL Licensed Products." *Id.* ¶ 53. But it is more than that. Fanatics is "the world's largest seller of licensed fan gear." *Id.* ¶ 142. And it is profoundly intertwined with the NFL Defendants. The NFL is a significant equity stakeholder of Fanatics, having bought a 3% stake of the company in 2017 for $95 million and followed up with a $320 million investment in early 2022. *Id.* ¶ 296. The NFL is able to recoup its investment both as the value of its equity increases and through licensing fees paid from Fanatics to the NFL, which total in the hundreds of millions of dollars. *Id.* ¶ 224.

Finances aside, Fanatics and its executive chairman, Michael Rubin, maintain exceptionally close personal relationships with the leadership of the NFL, including regularly sharing attendance at official NFL and Fanatics events and more-than-daily communication with major NFL figures like Patriots owner Robert Kraft. *Id.* ¶¶ 193–202. And Fanatics primarily conducts business online, as approximately 80% of its revenue comes from online merchandise sales. *Id.* ¶ 55.

These close financial and operational ties differentiate Fanatics from its nominal competitors—both other licensee manufacturers of NFL Licensed Products and other retailers who sell those products online—as Fanatics is able to accumulate more power than a typical market participant in part because the NFL stands to share in Fanatics' profits.

These profits are endangered by TPOMs like Amazon's Marketplace, which account for roughly a quarter of all U.S. online sales and host intense price competition among retailers. *Id.* ¶¶ 96-101. TPOMs function like a farmer's market or bazaar where a single location hosts multiple independent sellers, who often offer the same or similar products and compete on the basis of price or quality. *Id.* ¶ 108. TPOMs reduce transaction and start-up costs by allowing sellers to piggyback

on the brand recognition and traffic of the marketplace site, eliminating the need to design and drive traffic to individual e-commerce platforms—an advantage particularly valuable for retailers selling products identical or similar to those sold by many other retailers. *Id.* ¶ 100. TPOMs also lower barriers to entry for smaller retailers: a business can sign up to be an Amazon seller far faster than it can build its own website, and small retailers benefit from the name recognition and online "foot traffic" of established TPOMs, making it much easier to reach consumers than attracting them to an independent website. *Id.* TPOMs feature centralized payment processing that provides shoppers security when providing financial information and allows buyers to combine items from multiple sellers into a single purchase. *Id.* ¶ 272.

Critically, TPOMs benefit consumers by increasing price, quality, and service competition. Because TPOMs display all sellers of the same or similar products on the same webpage in response to consumer search terms, consumers can easily compare competing retailers' offerings. *Id.* ¶¶ 101, 111. On TPOMs, repricing frequency is much higher than on traditional e-commerce websites, with sellers often repricing in near real-time to compete for the "Buy Box," a feature by which a TPOM automatically selects which of several competing retailers to prioritize based mostly on price. *Id.* ¶ 101.

This competition posed a problem for Defendants: the presence of smaller price-cutting rivals on TPOMs prevented them from juicing their profits with high prices. *Id.* ¶ 108. Rather than figuring out how to meet this challenge through lawful competition, Defendants employed a group boycott to drive competing retailers from the online market for NFL Licensed Products. *Id.* ¶ 114.

**The Conspiracy.** Defendants' conspiracy consists of four related components.

First, beginning in 2016, NFLP informed licensees they would no longer be allowed to sell NFL Licensed Products to retailers who use TPOMs (the "No TPOM Sellers Policy"). *Id.* ¶ 117–

18. Defendants employed a "carrot-and-stick" approach to coerce licensees' cooperation: if a licensee did not comply, it would lose both its license to manufacture NFL Licensed Products and Fanatics' business; as the carrot, Fanatics promised to increase its purchases from licensees who played ball. *Id.* ¶ 116. The policy was selectively applied; Fanatics itself was allowed to sell on TPOMs while competitors were excluded. *Id.* ¶¶ 138, 204–06. In 2019, Fanatics became the exclusive provider of NFL Licensed Products on Walmart.com, a prohibited TPOM under NFLP's policies, yet Defendants declined to apply the No TPOM Sellers Policy to Fanatics itself. *Id.* ¶ 138.

Second, Defendants used their leverage with suppliers to enforce the group boycott. Fanatics served as the key driver and enforcer of the conspiracy. *Id.* ¶ 127. In October 2020, manufacturer WinCraft told Casey's, a retailer that competes with Fanatics, that it was "acting on behalf of Fanatics" when ordering Casey's to remove products from Amazon. *Id.* ¶ 189. After Fanatics acquired WinCraft in December 2020, a high-level WinCraft representative explained that Fanatics directed the request to eliminate its competitors, and that Fanatics' CEO was "really pissed off" that WinCraft had not been aggressively enforcing the policy. *Id.* ¶¶ 131–32, 287. In May 2021, licensee-manufacturer Logo Brands informed Casey's of a "new" "contractual agreement" it had "just signed with Fanatics which prevents 3rd part[ies] from selling Logo Brands products on Amazon." *Id.* ¶ 156. A Logo Brands high-ranking executive told Casey's that he had warned his own company's owners that they were making a deal with the devil. *Id.* ¶ 157.

Third, to capitalize on the boycott's success, Defendants implemented a domain-name licensing scheme. Instead of competing with one another, the NFL Defendants agreed to withdraw from the market in favor of allowing Fanatics to operate as a monopolist, sharing monopoly profits in return. *Id.* ¶ 168. The NFL now licenses its domain at "NFLShop.com" to Fanatics, and 27 of the 32 individual Teams do the same with their online stores. *Id.* ¶¶ 169-170. The result is that, in

the Complaint's words, "purported competition among Fanatics and the NFL Defendants in the online retail market for NFL Licensed Products now exists in (domain) name only." *Id.* ¶ 173.

Fourth, Defendants have prevented competing retailers from using NFL-related keywords to bid in search advertising auctions on Google, while allowing themselves and Fanatics to do so. *Id.* ¶¶ 175–79. This, of course, drives consumer traffic to Defendants' online stores and away from competitors. *Id.* On Amazon, Fanatics can list products using keywords such as "NFL" or team names, but competing retailers can only describe their products generically, such as describing a product as just a "shot glass" instead of a "Miami Dolphins Shot Glass." *Id.* ¶ 181. Because consumers almost invariably search for NFL Licensed Products using NFL-related keywords, this policy effectively renders competing retailers' listings invisible. *Id.* ¶¶ 182–83.

**The Result.** Unfortunately for consumers, Defendants' plan worked. Even though prices for NFL Licensed Products had been trending downward before the conspiracy, Defendants' conduct caused them to reverse course once the conspiracy began. *Id.* ¶ 213. These price increases coincide with booming growth in online retail generally, which, all else being equal, should enhance price competition—rising prices are therefore inconsistent with a competitive market environment. *Id.*

As Fanatics' executive chairman Michael Rubin has acknowledged, if NFL Licensed Products were commonly available through other retailers, "there'd be no reason for [Fanatics] to be," and "[i]f your strategy is just to win on price, you're eventually going to die." *Id.* ¶ 11. The conspiracy has enabled Defendants to charge supracompetitive prices, with "[t]he Leagues and Teams mak[ing] a lot more money in this business than they used to make under the old model." *Id.* ¶ 229. The net result is exactly what one would expect from reduced competition: product quantity, diversity, variety, and quality are reduced while prices increase. *Id.* ¶ 232. Defendants'

scheme has caused Plaintiff and class members to pay artificially inflated prices for NFL Licensed Products purchased online. *Id.* ¶¶ 69, 329.

## LEGAL STANDARD

An antitrust complaint, like any other, simply must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Courts deciding a motion to dismiss "draw all reasonable inferences in Plaintiffs' favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

In doing so, courts should bear in mind that no heightened pleading standard applies in antitrust cases, *Twombly*, 550 U.S. at 556-57, that "the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole," *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962), and that "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *In re Keurig Green Mt. Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 218 (S.D.N.Y. 2019). That latter point reflects the common-sense understanding that, in an antitrust conspiracy, the "smoking gun" of direct evidence "can be hard to come by, especially at the pleading stage," so "a complaint may, alternatively, present circumstantial facts supporting the *inference* that a conspiracy existed." *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) (emphasis in original).

## ARGUMENT

## I.    Plaintiff Pleads Defendants Engaged in an Anticompetitive Conspiracy.

To prove a violation of Section 1 of the Sherman Act, "a plaintiff must demonstrate: (1) a combination or some form of concerted action between at least two legally distinct economic

entities that (2) unreasonably restrains trade." *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 506 (2d Cir. 2004). On the first element, a plaintiff must allege "an agreement, tacit or express." *Twombly*, 550 U.S. at 553. On the second, "[u]nreasonableness . . . could be based either (1) on the nature of character of the contracts, <u>or</u> (2) on surrounding circumstances giving rise to the inference or presumption that they were intended to restrain trade and enhance prices." *Nat'l Soc. of Pro. Eng'rs v. United States*, 435 U.S. 679, 690 (1978) (outlining history of rule of reason). The Supreme Court has noted that "no bright line separate[es]" the former approach (the *per se* rule) from the latter (the rule of reason). *See NCAA v. Board of Regents of University of Oklahoma,* 468 U.S. 85, 104 n.26 (1984) (noting "the essential inquiry remains the same—whether or not the challenged restraint enhances competition").

Because the rule of reason is a fact-intensive approach, courts routinely hold that the ultimate decision of which approach to apply is better made at summary judgment than in deciding a motion to dismiss. *See Berger v. JetBlue Airways Corp.*, No. 22-cv-7374, 2024 WL 4107243, at *7 (E.D.N.Y. Sept. 6, 2024) (declining to choose a standard for motion to dismiss because "[a]t this stage of the litigation the Court cannot determine that the *per se* rule is entirely inapplicable"); *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1122 (N.D. Cal. 2012) (decision of which standard applies "is more appropriate on a motion for summary judgment"); *Int'l Constr. Prods. LLC v. Caterpillar Inc.*, 419 F. Supp. 3d 791, 807 (D. Del. 2019) (same); *CSR Ltd. v. Fed. Ins. Co.*, 40 F. Supp. 2d 559, 564 (D.N.J. 1998) (same).

A full application of the rule of reason at the motion to dismiss stage is impossible because complete "consideration of alleged procompetitive effects of defendants' actions and the ultimate judgment of whether any procompetitive effects 'outweigh' any anticompetitive effects is

inappropriate" so early in the litigation. *Davitashvili v. Grubhub Inc.*, No. 20-cv-3000, 2022 WL 958051, at *6 (S.D.N.Y. Mar. 30, 2022).

Plaintiff's complaint concerns an overarching conspiracy broken into four components: (1) a group boycott of competitors who used TPOMs; (2) exclusive dealing arrangements that undercut other retailers' supply; (3) anticompetitive licensing agreements not to compete; and (4) keyword advertising restrictions. The first of these is a *per se* violation of the antitrust laws that itself suffices to state a claim. And together, these components constitute an unreasonable restraint on trade under the rule of reason.

### A.    Plaintiff has alleged a group boycott among horizontal competitors, which is *per se* unlawful.

A group boycott, sometimes called a concerted refusal to deal, "is an agreement to pressure a supplier or customer not to deal with another competitor." *Reading Int'l, Inc. v. Oaktree Cap. Mgmt. LLC*, 317 F. Supp. 2d 301, 318 (S.D.N.Y. 2003). The Supreme Court "has long held that certain concerted refusals to deal or group boycotts are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as *per se* violations of § 1 of the Sherman Act." *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 290 (1985). The question is whether the plaintiff has presented "a threshold case that the challenged activity falls into a category likely to have predominantly anticompetitive effects." *Id.* at 298. One such category of boycott is "horizontal agreements among direct competitors," which automatically receive *per se* treatment. *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998).

Here, Plaintiff has alleged that NFLP, Fanatics, and the 32 Teams are horizontal competitors because each are retailers who sell NFL merchandise online. Compl. ¶¶ 245, 260, 293. There is no real dispute on this point. As the complaint alleges, "[i]n the absence of a conspiracy

promising the ability to set monopoly pricing, each Team would compete to sell their own NFL Licensed Products." *Id.* ¶ 214. More than that—"[b]efore the agreements and conduct described in th[e] Complaint, each Team could and did compete individually as retailers in the online market for NFL Licensed Products." *Id.* ¶ 236. Further, there does not appear to be any dispute that all Defendants compete with other online sellers of NFL Licensed Products.

And yet, despite their status as ostensible competitors, Defendants have entered into a series of agreements with one another that jointly constitute an overarching anticompetitive conspiracy to "leverage[ ] their market power over licensees to force those licensees to boycott smaller retailers who sold NFL Licensed Products through TPOMs." *Id*. ¶ 115. As described above, this boycott was enforced through a variety of separate agreements and policies, all of which served the conspiracy's larger purpose: eliminating competitors who sell NFL Licensed Products through online platforms not owned by the NFL Defendants or Fanatics.

No need to take Plaintiff's word for it: boycotting these smaller retailers is an express term of Defendants' policies. *See id*. ¶ 120 (quoting NFL's Online Distribution Policy, which requires licensees to "ensure that . . . any retailer shall not offer such products for sale via the website portal of a third party that is not otherwise authorized by NFLP"), *see also id.* ¶¶ 118, 121–23, 125, 128. As the complaint further alleges, "[t]he foreseeable result of the boycott was to reduce the number of online retailers selling NFL Licensed Products to consumers on TPOMs." *Id*. ¶ 137.

The Supreme Court has long held that concerted conduct by competitors that excludes third-party merchants from the market is unlawful. In *United States v. General Motors Corp.*, 384 U.S. 127 (1966), the Court ruled that a group boycott of "discounters" who sold Chevrolet cars at lower prices, was a *per se* violation of the antitrust laws. General Motors, the manufacturer, had utilized its power within the market, and its existing contractual relationships, to pressure car

dealers *not* to sell cars to these discounters for resale. *See id.* at 140. As the Court straightforwardly reasoned, "[e]limination, by joint collaborative action, of discounters from access to the market is a *per se* violation of the Act." *Id*. at 145. The real concern, noted the Court, was that the boycott instituted "a substantial restraint upon price competition—a goal unlawful per se when sought to be effected by combination or conspiracy," even "when the effect upon prices is indirect." *Id*. at 147. As if anticipating Defendants' arguments here, the Court found it "of no consequence" for its analysis (1) that the contracts in question contained "lawful or economically desirable" provisions; (2) that the manufacturer could conceivably achieve a similar result "by unilateral action"; or (3) what "economic motivations underl[ie]" the conduct in question. *Id*. at 140, 142, 147.

For the same reasons, Defendants' scheme here is unlawful. Defendants have attempted to neutralize some of the few remaining actors who might be able to compete with them on price and have done so by means of contracts that expressly provide for the competing merchants' exclusion. This classically anticompetitive conduct damages the integrity of the market by its very nature, and is therefore deserving of *per se* treatment. *See Standard Oil Co. of New Jersey v. United States,* 221 U.S. 1, 64-65 (1911) (prescribing *per se* treatment "where the nature and character of the dealing" was proof of anticompetitive effect)*.*

      **B.**    **Plaintiff also states a claim under the rule of reason.**

In the alternative, Plaintiff also sufficiently alleged that Defendants' conspiracy unreasonably restrained trade under the rule of reason. That rule lays out a three-step burden-shifting approach: First, the "plaintiff bears the initial burden of showing the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market"; then "the burden shifts to the defendant to offer evidence of the pro-competitive 'redeeming virtues' of their combination"; finally, "the burden shifts back to plaintiff for it to demonstrate that any legitimate

13

collaborative objectives . . . could have been achieved by less restrictive alternatives." *Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993) (quoting 7 Phillip Areeda, Antitrust Law ¶ 1502, at 371 (1986)). Because a full rule of reason analysis is complex and near impossible to conduct without the benefit of discovery, a plaintiff at the motion to dismiss stage need only allege facts that "describe the challenged restraint, the contours of the relevant market, the anticompetitive effects the restraint has on that market, and an injury suffered by the plaintiff that the antitrust laws were intended to prevent" flowing from the restraint. *Mooney v. AXA Advisors, L.L.C.*, 19 F. Supp. 3d 486, 498 (S.D.N.Y. 2014); *see also Quad Cinema Corp. v. Twentieth Century-Fox Film Corp.*, No. 76 CIV 4452, 1983 WL 1822, at *7 (S.D.N.Y. May 12, 1983) (denying summary judgment because material issues of fact remained concerning anticompetitive effects).

Plaintiff proceeds in that same order—describing the challenged behavior, outlining the market, describing the anticompetitive effects of that behavior, and asserting the bases for his standing.

### 1. Plaintiff has alleged a multipronged conspiracy to preclude price competition in the relevant market.

Plaintiff alleges that Defendants have orchestrated a multipronged conspiracy to preclude price competition in the online market for Licensed NFL Products. The main pillar of that conspiracy is the group boycott of sellers who compete on TPOMs, which is unlawful *per se* as described above. *See supra* Section I.A. But when analyzing Defendants' conduct under the rule of reason, the group boycott is unreasonable both on its own and in combination with several of Defendants' other practices. In addition to the group boycott, the complaint alleges further unlawful agreements pertaining to (1) improper pressure imposed by Fanatics on its suppliers to

boycott other online sellers, (2) domain name licensing that gives the impression of consumer choice while excising its benefits, and (3) keyword search restrictions that prevent other authorized retailers from competing.

With respect to exclusive dealing, the complaint contains well-pleaded allegations that "Fanatics' agreements with the manufacturers that supply it with NFL Licensed Products require that if a manufacturer wants to sell to Fanatics, it must refuse to sell NFL Licensed Products to any other retailer who primarily sells online (the 'No Online Retailers Policy')." Compl. ¶ 152. These agreements are designed to be "difficult for manufacturers to terminate." *Id.* Plaintiff specifically alleges that "Fanatics entered into at least two such agreements with licensee-manufacturers," including WinCraft and Logo Brands. *Id.* For example, Logo Brands demanded that a retailer "remove products that [it] listed on Amazon due to a 'new' 'contractual agreement' Logo Brands 'just signed with Fanatics which prevents 3rd part[ies] from selling Logo Brands products on Amazon.'" *Id.* ¶ 156. The "intent and effect" of these exclusive dealing arrangements is "to manipulate licensees into cutting off the supply of NFL Licensed Products to Defendants' competitors." *Id.* ¶ 249. They allow Fanatics to leverage its position as a dominant *buyer* of NFL Licensed Products to exclude other competitors in the retail space.

Plaintiff also alleges that Defendants entered into anticompetitive domain-name licensing agreements. Rather than competing with one another, the NFL "now licenses its domain at 'NFLShop.com' to Fanatics; Fanatics operates the site just as it operates its 'Fanatics.com' storefront, selling the exact same NFL products at the exact same prices." *Id.* ¶ 169. In other words, "the NFL Defendants have collectively agreed to withdraw from the market in favor of allowing Fanatics to operate as a monopolist." *Id.* ¶ 168. Thus, "instead of competing for sales, Defendants have simply handed Fanatics the proverbial keys to their stores." *Id.* ¶ 169. These "domain-name

15

licensing agreements are anticompetitive when used, as here, by horizontal competitors to consolidate a monopoly in a chosen conspirator, who then shares the profits with its competitors that are in on the scheme." *Id.* ¶ 174.

Finally, Plaintiff alleges that Defendants restrict competing retailers' ability to advertise and describe their products online using NFL-related keywords. *Id.* ¶¶ 175–185. On Google, "sellers participate in auctions for the right to have links to their pages appear as search advertising." *Id.* ¶ 178. Plaintiff alleges that "[t]he NFL Defendants have prevented competing retailers of NFL Licensed Products from using NFL-related keywords to bid in these auctions while allowing themselves and Fanatics to do so. The result is that consumer traffic is driven to Defendants' online stores and away from those of competing retailers." *Id.* ¶ 179. On the Amazon Marketplace, "the NFL Defendants prevent competing retailers from using NFL-related keywords necessary to render those retailers' offerings visible to consumers." *Id.* ¶ 181. Thus, unlike Fanatics, "competing retailers can only describe their products generically," which works to their extreme detriment. *Id.* Because consumers "will almost invariably search for NFL Licensed Products by using keywords related to the NFL or the team of interest," this policy "effectively render[s] those listings invisible to consumers." *Id.* ¶ 182. This policy serves to conceal the very existence of both possible alternatives and of the conspiracy itself, because "consumers cannot acquire knowledge that competing retailers are even offering NFL Licensed Products for sale." *Id.* ¶ 318.

### 2.    Plaintiff has sufficiently pled the relevant market for this stage in the litigation.

At this stage, Plaintiff need not plead the relevant market with specificity. Instead, the complaint's market definition need only be "plausible" and bear "a rational relation to the

methodology courts prescribe to define a market for antitrust purposes." *Todd v. Exxon Corp.*, 275 F.3d 191, 200 (2d Cir. 2001). Typically, dismissal for failure to allege a market is appropriate only where a plaintiff inappropriately "attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes," or in cases of "failure even to attempt a plausible explanation as to why a market should be limited in a particular way." *Id*. Where a plaintiff's market definition is adequately supported by well-pleaded factual allegations, it suffices to state a claim.

A "product market" consists of a market of goods that substitute for one another. Stated more formally, its boundaries are determined by "the reasonable interchangeability of use or the cross-elasticity of demand" between the product and any substitutes. *Brown Shoe v. U.S.*, 370 U.S. 294, 325 (1962). If consumers would buy a substitute product in response to price increases, then the products are reasonably interchangeable.

Plaintiff clears that low bar. The market definition alleged—the "online retail market for new NFL Licensed Products"—is reasonable. The complaint alleges that consumers purchase NFL Licensed Products primarily to express loyalty to specific NFL Teams, making products bearing other logos unreasonable substitutes. Compl. ¶¶ 277, 279. There is neither reasonable interchangeability nor cross-elasticity of demand between NFL Licensed Products and other products, as the NFL has a distinct fan base separate from other professional football leagues— such as the Arena Football One ("AF1") league and the Indoor Football League ("IFL")—which play "substantially different sport[s]" with "discrete fan base[s]" *Id*. ¶ 281. Simply put, no one looking to purchase a New York Giants jersey would be happy to substitute that with a jersey of the closest AF1 team, the Albany Firebirds. The complaint further alleges that online retail constitutes a distinct market from brick-and-mortar retail, given the "inelasticity of demand

between products available for purchase online and those that can be purchased at brick-and-mortar stores," such that brick-and-mortar prices "do not meaningfully constrain the prices charged by online retailers." *Id.* ¶¶ 261–64.

The alleged market definition is further supported by the fact that Defendants use it themselves, with Fanatics repeatedly referring to the "licensed sports merchandise" industry and industry participants tracking economic and financial statistics for NFL Licensed Products separately from other products. *See id.* ¶ 278.

The complaint also more than adequately alleges that Defendants have market power in the relevant market. The complaint alleges that "Fanatics, the NFL, and the Teams collectively dominate the online retail market for NFL Licensed Products" and that "[w]ithin the online retail market for NFL Licensed Products in the United States, Defendants possessed and exercised the power to profitably increase prices and restrict output in the market through their control of licensees and online retail domains." *Id.* ¶ 294. The complaint further alleges that Fanatics' share of the online market for NFL Licensed Products "has been over 50% since 2017," and that Fanatics' market power "is recognized by industry observers," including *Sportico*, which reported that Fanatics "has more or less cornered the industry," and industry commentators who have called Fanatics "the 'Amazon of sports apparel.'" *Id.* ¶ 300. The complaint alleges that "[b]y itself, Fanatics' market share is sufficient to infer market power in the relevant market" and that, combined with the market share of the NFL Defendants, the Defendants collectively "control the vast majority of the online market for NFL Licensed Products." *Id.* ¶ 301. Moreover, "Defendants' market power gives them the ability to exclude other competitors," as "Defendants demonstrated their actual market power by prohibiting licensees from selling to retailers operating on TPOMs and thus competing with Defendants' own retail operations." *Id.* ¶ 302.

It is, for the most part, too early to address Defendants' myriad arguments about market definition. The Second Circuit habitually notes that "[b]ecause market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market. *Todd*, 275 F.3d at 199–200 (*citing Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design,* 244 F.3d 521, 531 (6th Cir.2001) ("Market definition is a highly fact-based analysis that generally requires discovery.")).

In addition to being premature, Defendants' granular attacks on the proposed market definition are also unconvincing. For example, their contention that licensed apparel need not be distinguished from non-licensed apparel, *see* NFL Mot. at 18, fails on its face. Licensed sports merchandise is sold at a premium over non-licensed merchandise; a consumer who only "need[s] one shirt" regardless of its design is not expected to pay the typically higher prices for officially licensed sports merchandise (as alleged in the complaint, $37.99 for a t-shirt). *See id.* at 18; *see also* Compl. ¶ 303.

Nor do Defendants successfully argue for the consolidation of all retail channels into a single, enormous market. As courts routinely recognize, "[a] product market can be limited to a particular category of buyers." *P & L Dev., LLC v. Gerber Prods. Co.*, 715 F. Supp. 3d 435, 459 (E.D.N.Y. 2024). In other words, "the fact that two vendors both sell a particular type of merchandise does not necessarily mean that they are in the same product market." *Bon-Ton Stores, Inc. v. May Dep't Stores Co.*, 881 F. Supp. 860, 869 (W.D.N.Y. 1994). What Defendants are transparently trying to do is to define the market so unimaginably broadly—as encompassing all sports merchandise, or perhaps all clothing in general—that "it is hard to conceive of any merger or acquisition involving retailers that would have an anti-competitive effect." *Id*. This Court should not let them.

19

### 3.    Defendants' conspiracy caused actual detrimental effects on competition.

Defendants' arguments concerning the rule of reason omit the most important part of an antitrust case: "proof of actual detrimental effects on competition." *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018) ("*AmEx*"). Under *AmEx*, detrimental effects may be shown by allegations of "reduced output, increased prices, or decreased quality." *Id.* at 542. Plaintiff specifically alleges both increased prices and decreased quality in NFL Licensed Products.

**Prices**. There is no disagreement that prices for NFL Licensed Products have skyrocketed during the period at issue in the complaint. Plaintiff alleges in detail that the decline in competition following the boycott policy has led to increased prices from their prior competitive levels. As alleged in the complaint, "[b]efore 2016, online retail prices for NFL Licensed Products were trending steadily downward. Since 2017, however, prices have reversed course and have increased each year as Defendants' anticompetitive conduct has allowed them to charge consumers ever higher supracompetitive prices." Compl. ¶ 303. The complaint even provides a concrete example: "a Fanatics-branded Super Bowl Champion Locker Room T-Shirt that cost $27.99 in 2017 cost $37.99 (plus shipping) in 2022." *Id*. These price increases occurred despite "booming growth in online retail generally, which, all else being equal, should enhance price competition," making the rising prices proof that Defendants are distorting the market to raise prices. *Id.* ¶ 213. This works to the detriment of consumers like Mr. Franz. *Id.* ¶ 337.

**Choice and Quality**. Defendants' conspiracy has also reduced consumer choice. In a fully competitive environment, the multitude of retailers on a given TPOM would have to distinguish their listings—not just in terms of price, but also with respect to shipping, returns, promotions, service, and other terms of sale. As the complaint alleges, this feature is integral to the TPOM

model. *See Id.* ¶ 269  (describing how a TPOM "hosts multiple independent sellers, who often offer the same or very similar products and compete on the basis of price or quality"). With these differentiated options, consumers could choose the seller and product that best suited their needs. Defendants' conduct substantially reduced those options. *See id*. ¶¶ 137, 208, 256. For related reasons, the decrease in choice has led to a race to the bottom in quality, as the establishment of a hegemonic NFL-Fanatics "one-stop shop" has left customers unable to vote with their wallet for higher-quality or lower-price options. *See id*. ¶ 230, 232, 244. The decrease in the quality of Fanatics products is so significant that it has been the subject of pushback from the entire sports world, including players themselves. *See* Drew Magary, "Fanatics has finally pissed off the wrong people," *SFGate* (Feb. 15, 2024), available at https://www.sfgate.com/giants/article/fanatics-finally-pissed-off-wrong-people-18667772.php (documenting negative reaction from fans and players to recently unveiled Fanatics jerseys).

### 4.    Plaintiff has standing because he is the efficient enforcer of the antitrust laws as a purchaser.

The Supreme Court has described antitrust injury as "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). This Circuit employs a three-step inquiry to determine whether the antitrust injury requirement is met:

> First, the plaintiff must identify the practice complained of and the reasons the practice is or might be anticompetitive. Second, the court must identify the actual injury alleged by the plaintiff. Third, the court must compare the anticompetitive effect of the practice at issue to the actual injury alleged by the plaintiff.

*Keurig*, 383 F. Supp. 3d at 220. Contrary to the NFL Defendants' contentions, antitrust standing is analyzed by *claim*, not by *policy* challenged. *Compare In re Aluminum Warehousing Antitrust*

*Litig.*, 95 F. Supp. 3d 419, 440 n.22 (S.D.N.Y. 2015) ("Plaintiffs must establish antitrust standing with respect to each antitrust claim pursued.") *with* NFL Mot. at 11–12 (focusing on Plaintiff's standing to challenge the NFL's licensing *policies* rather than his § 1 claim as a whole). The Complaint satisfies these requirements.

Plaintiff's standing, as a direct purchaser of NFL Licensed Products from Defendants, could not be clearer. Plaintiff repeatedly alleges that Defendants' group boycott has caused him to pay higher prices for NFL Licensed Products—the archetypal antitrust injury. *See Blue Shield of Virginia v. McCready*, 457 U.S. 465, 482 (1982) (taking for granted that "an increase in price resulting from a dampening of competitive market forces" is an injury redressable by the antitrust laws); *see also* Compl. ¶ 12 (alleging the conspiracy caused "Plaintiff and the proposed class of direct online purchasers of NFL Licensed Products [to pay] more than they otherwise would have for their purchases"). These allegations are thorough and specific. *See id*. ¶ 69 (alleging Defendants' "conspiracy and anticompetitive conduct described in this Complaint caused, and continues to cause, Plaintiff and the members of the Class to pay unlawfully inflated prices for NFL Licensed Products purchased from Defendants"); *see also id.* ¶¶ 329, 337, 340 (alleging Defendants' conspiracy enabled them "to set and/or maintain prices at artificially high levels"). The complaint goes so far as to allege price increases in granular detail—taking an illustrative example of both an item of clothing and typical shipping charge to show all the ways in which Defendants' conduct hurts Plaintiff. *Id*. ¶ 77–78.

This price inflation directly flows from Defendants' successful efforts to drive out competitors from the relevant market, including through their boycott of retailers selling on TPOMs, which "removed the downward pressure on prices and margins that, absent the conspiracy, would have otherwise flowed directly from enhanced competition." *Id.* ¶ 103. Indeed,

market data shows that "prices for NFL Licensed Products were trending downward before the beginning of the conspiracy but reversed course once Defendants began to collude." ¶ 209.

These allegations also serve as a clear distinction from *Casey's*, where the plaintiffs were initially found to lack standing. This Court in *Casey's* found that plaintiff failed to demonstrate antitrust injury "of the type the antitrust laws were intended to prevent." *Casey's*, 2025 WL 1928544 at *4. However, that finding turned on Casey's specific position as a retailer-distributor alleging it was harmed by being excluded from TPOMs after purchasing products from licensees. Am. Compl., *Casey's* Dkt. No. 52 ¶¶ 6, 92-94. Critically, the *Casey's* damages theory focused on lost profits from being unable to resell on Amazon, alleging that its "Amazon TPOM sales of NFL Licensed Products suddenly plummeted." *Id.* ¶ 118.

In stark contrast, Plaintiff here is a direct consumer purchaser who alleges he "purchased NFL Licensed Products directly from Defendants" and "paid more than [he] otherwise would have for [his] purchases." Compl. ¶¶ 4, 14. Unlike *Casey's*, which sought to challenge upstream licensing decisions as an excluded retailer, Plaintiff challenges a horizontal conspiracy that resulted in him paying "anticompetitive overcharges." *Id*. ¶ 78. Furthermore, the instant complaint identifies specific anticompetitive effects that were absent in *Casey's*.

The antitrust laws are designed precisely to protect consumers like Plaintiff from paying supra-competitive prices resulting from horizontal agreements among competitors. Mr. Franz's direct purchaser status and concrete allegations of price effects distinguish his standing from the indirect, exclusionary injuries that proved fatal in *Casey's*.

## II.    The Defenses Raised in Defendants' Motions Fall Flat.

Faced with these allegations, Defendants resort to defenses that range from self-defeating to wholly foreclosed by Supreme Court precedent. Namely, they argue that (A) the alleged

anticompetitive conduct principally concerns permissible authorized retailer and trademark license agreements, (B) the presence of NFLP as a "vertical" actor means the other NFL Defendants play no part in the conspiracy, (C) this Court's decision in *Casey's* already rubber-stamped the legality of the challenged policies; and (D) independent parts of the alleged conspiracy are presumptively lawful on their own. Each of these is wrong for different reasons.

### A.    Defendants' conspiracy goes well beyond ordinary licensing, supply, and authorized merchant agreements.

In attempting to justify their anticompetitive conduct, Defendants continually fall back on the usual permissibility of exclusive dealing arrangements tied to intellectual property—be they licensing agreements, authorized retailer policies, or trademark enforcement. *See* NFL Mot. at 16, 21–23; Fanatics Mot. at 8–15.

But that misconstrues Plaintiff's allegations, which focus on both specific agreements to boycott certain competitors (a *per se* violation of the antitrust laws) and Defendants' overarching conspiracy to give Fanatics a dominant share of the online retail market for NFL Licensed Products. This Court need not rule on the abstract permissibility of trademark licensing to determine that the specific agreements in question here have a combined anticompetitive effect on the market. *See Associated Press v. United States*, 326 U.S. 1, 14 (1945) ("But however innocent such agreements might be, standing alone, they would assume quite a different aspect if utilized as essential features of a program to hamper or destroy competition"). No matter what it is used for in the ordinary course of business, "this circuit has also recognized that *any* type of vertical agreement may represent an antitrust violation if it is tainted by other illegalities, as has been alleged here." *Reading Int'l, Inc. v. Oaktree Cap. Mgmt. LLC*, 317 F. Supp. 2d 301, 320 (S.D.N.Y. 2003) (citing *United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 241-43 (2d Cir. 2003) (finding

vertical agreements illegal where they resulted from horizontal conspiracy)).

The *Keurig* litigation is instructive. The plaintiffs there alleged that a dominant market player, Keurig, agreed with its licensed coffee roasters and brands (1) "not to sell beverage products" to competitors; (2) "not to license brands" to such competitors, and (3) not to permit these competitors to manufacture competing products. *Keurig*, 383 F. Supp. 3d at 243–44. There, too, the defendants sought refuge in their exclusive dealing arrangements, arguing that "supply agreements—such as those covering intellectual property, distribution, or manufacturing" are permissible vertical agreements. *Id*. at 244. The court disagreed, finding that the agreements "are directly related to the competitive landscape" in the relevant market. *Id*. In addition, in denying the motion to dismiss plaintiffs' group boycott claims, the court found that the authorized distributor policy in question violated the antitrust laws by "conspiring with competitor roasters and coffee brands to enter into anticompetitive agreements to refuse to deal" with competitor manufacturers, and "coercing distributors and retailers to enter into anticompetitive agreements to refuse to deal with" such competitors. *Id*. at 245. The court indicated its ruling would be the same "even if the allegations were insufficient to support horizontal restraints." *Id*. at 246.

Similarly, in recent litigation against Fanatics, this court rejected identical arguments that attempted to immunize anticompetitive conduct from scrutiny on the grounds that it concerned "strictly vertical licensing agreements." *See Panini Am., Inc. v. Fanatics, Inc.*, No. 23-CV-9714, 2025 WL 753954, at *10 (S.D.N.Y. Mar. 10, 2025). The *Panini* court ruled that "[w]hile a licensor does possess a natural and unobjectionable monopoly over its own intellectual property, vertical licensing arrangements may still run afoul of antitrust laws, particularly in a highly concentrated market. . . . To hold otherwise would immunize intellectual property from the antitrust laws altogether, a protection that has no legal basis." *Id*.

This conclusion aligns with longstanding precedent within and outside of this circuit. The Second Circuit has held that the "mere fact that an agreement implicates intellectual-property rights does not 'immunize [the] agreement from antitrust attack.'" *1-800 Contacts, Inc. v. Fed. Trade Comm'n*, 1 F.4th 102, 113 (2d Cir. 2021) (quoting *F.T.C. v. Actavis, Inc.*, 570 U.S. 136, 147 (2013)). Indeed, most antitrust cases, including most exclusive-dealing cases, involve intellectual property. These include branded gasoline (as in the Supreme Court's seminal exclusive-dealing case, *Standard Oil Co. of California v. United States*, 337 U.S. 293 (1949)), or myriad patented, copyrighted, and usually trademarked products.

*United States v. Griffith*, 334 U.S. 100 (1948), is illustrative. Like Fanatics, the defendant there obtained *exclusive* licenses from upstream movie licensors, which pushed out other competitors from the relevant market. *Id*. at 101–04. A licensee's "right to exhibit a film" constitutes "a monopoly," and a defendant violates the antitrust laws by using that monopoly power "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Id.* at 106–07. The Court held that the licensee defendant in *Griffith*, just like Fanatics here, abused its trademark license monopoly by using it to acquire further "exclusive privileges." *Id*. at 109. That these exclusive privileges are related to exclusive licenses to use intellectual property was irrelevant. *See Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 18–19, 24 (1979) (considering anticompetitive effects of "blanket licensing" of performing rights to copyrighted music). *Spinelli v. National Football League*, 96 F. Supp. 3d 81 (S.D.N.Y. 2015), which Fanatics cites, says no different. The court there simply observed that exclusive trademark licenses are presumptively legal unless they cross the line into anticompetitive conduct and thereby restrain trade. The *Spinelli* court never held that trademark licenses or authorized retailer agreements are exempt from the antitrust laws.

26

Here, Defendants have exceeded the permissible scope of their licensing agreements by engaging in multi-layered anticompetitive behavior and directing such behavior at horizontal competitors. Specifically, Defendants have conspired to boycott competing retailers from TPOMs, Compl. ¶¶ 7, 114-16, leveraged exclusive dealing arrangements to deny competitors access to suppliers, *id*. ¶¶ 128, 152, 160, and prohibited competitors from using NFL-related keywords necessary for online advertising. *Id.* ¶¶ 10, 179, 181-82. These agreements extend far beyond lawful vertical licensing arrangements and, as Defendants have used their dominant market position to eliminate competition and maintain monopoly prices, constitute textbook anticompetitive harm which goes far beyond the permissible scope of exclusive dealing.

Defendants' speculative procompetitive benefits are unavailing. For starters, "any procompetitive justification" for Defendants' conduct "is not appropriately weighed on a motion to dismiss." *Keurig*, 383 F. Supp. 3d at 239. And the justifications themselves are paper-thin. Fanatics goes so far as to argue that licensees' compliance with the NFL's demands shows that the agreements are procompetitive because each licensee has an "interest in maintaining their licenses and being able to sell NFL Licensed Products." Fanatics Mot. at 11. Besides being circular, this contention demonstrates precisely the anticompetitive harm at issue here: the control NFLP exerts over its licensees extends to forcing them to engage in a group boycott they would not support absent such a threat.

### B. Defendants cannot hide their conspiracy within NFLP's so-called "vertical" structure.

The Supreme Court has already decided that the NFL Defendants cannot use their consolidation of licensing rights into a single vertically integrated entity, NFLP, as a shield against antitrust liability. In *American Needle, Inc. v. National Football League*, 560 U.S. 183 (2010), the

Court specifically rejected the NFL Defendants' argument that there can be no conspiracy in restraint of trade because "the teams have organized and own a legally separate entity that centralizes the management of their intellectual property." *Id*. at 197. In the Court's memorable phrasing, "[a]n ongoing § 1 violation cannot evade § 1 scrutiny simply by giving the ongoing violation a name and label." *Id*. *American Needle*, which Fanatics ignores completely and the NFL Defendants refer to only in passing, makes clear that routing anticompetitive conduct through NFLP does not automatically render it vertical or unilateral because "decisions by NFLP regarding the teams' separately owned intellectual property constitute concerted action." *Id*. at 201.

Even considering NFLP as a vertical market participant instead of a joint venture by competitors does not protect NFL Defendants from the *per se* rule. Consistent with the Second Circuit's ruling in *United States v. Apple, Inc.*, 791 F.3d 290 (2d Cir. 2015), the relevant question in this case is whether the NFLP organized a horizontal group boycott of retailers who sell NFL Licensed Products on TPOMs, not the terms of NFLP's licensing agreements with its licensors— "horizontal agreements with the purpose and effect of raising prices are *per se* unreasonable because they pose a 'threat to the central nervous system of the economy'; that threat is just as significant when a vertical market participant organizes the conspiracy." *Id*. at 323 (quoting *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 224 n. 59 (1940)); *see also* Compl. ¶ 89 ("Firms that occupy upstream positions in the supply chain of NFL Licensed Products as manufacturers or trademark owners may also be retailers selling directly to consumers.").

So, Defendants' repeated insistence that the No-TPOM Sellers Policy is "unilateral" or permissible because it is tied to licensing misses the mark. The policy is an agreement among competitors to boycott certain retailers who use disfavored platforms to compete on price—the rest is noise.

**C.    *Casey's* is not to the contrary.**

Defendants repeatedly insist that this Court's decision in *Casey's* already decided the legality of Defendants' alleged conduct. *See* Fanatics Mot. at 1–3, 8, 14; *see generally* NFL Mot. But the cited portion of *Casey's* reflects only the Court's conclusion that the *Casey's* plaintiffs— who were the distributors, not the consumers—did not adequately allege "anything anticompetitive" about the challenged policies for purposes of establishing their own standing. *Casey's*, 2025 WL 1928544 at *4. And, it gave Casey's leave to replead to remedy this use. For the reasons described above, *see supra* Section I.B.4., Plaintiff here has more than adequately alleged standing precisely because he is differently situated; consumers like Mr. Franz are in the best position to sue because they directly pay the higher prices that result from decreased competition.

In addition, Plaintiff's complaint more specifically alleges both the type of horizontal collusion and anticompetitive effects that were missing in *Casey's* before leave to amend was granted. Plaintiff specifically alleges that "Defendants colluded to boycott competing retailers who sold NFL Licensed Products through TPOMs" which "eliminated Defendants' competitors who would have charged lower prices." Compl. ¶ 103. The conduct in question, in other words, is not about who gets licenses to manufacture but instead about horizontal coordination among retailers to eliminate price competition at the consumer level.

Furthermore, Plaintiff alleges horizontal agreements among the NFL Defendants and Fanatics as competing retailers to "fill the void by entering exclusive dealing arrangements that denied their competitors access to manufacturers and suppliers" and to "enter[] into anticompetitive licensing agreements to further reduce competition." *Id*. ¶¶ 104-105. These are horizontal restraints among competitors at the retailer level, not vertical licensing decisions

29

"further up the stream of commerce." *Casey's*, 2025 WL 1928544 at *4.

Moreover, while the Court found Casey's failed to allege "anything anticompetitive" about the authorization requirements, Mr. Franz alleges specific anticompetitive effects flowing directly to consumers: prices that "reversed course and have increased each year," including concrete examples of item and shipping prices. Compl. ¶ 77. This is exactly the type of allegation this Court said was missing in *Casey's*, when it remarked that a "truly anticompetitive agreement to severely limit competition would have, as an anticipated result, higher prices for consumers." *Casey's*, 2025 WL 1928544 at *5.

### D. Defendants' arguments about "presumptively lawful" contract provisions rest on a fundamental error.

Time and time again, Defendants implore this Court to consider the courses of conduct challenged in the complaint one by isolated one. Precisely, Defendants (1) argue that Plaintiff needed to "direct" a cause of action at "the upstream agency agreement that established NFLP," NFL Mot. at 10; (2) apply the rule of reason and antitrust standing analyses only to certain policies;[2] and (3) consistently rely on the refrain that contract provisions, including authorized retailer and trademark licensing agreements, are "presumptively lawful" when viewed in isolation.[3]

---

[2] *See* NFL Mot. at 11–13 (discussing antitrust standing only "with respect to NFLP's trademark licenses"), 17–21 (applying rule of reason only to ODP), 21–23 (discussing legality of trademark practices with no reference to other conduct).

[3] *See* NFL Mot. at 14 ("The ODP is a unilateral, vertical, non-price, restraint, no different from the hundreds of lawful, authorized reseller policies used to support their manufacturer or licensor brands"), 23 (treating each team's agreement to use Fanatics to manage their merchandise sales as "a unilateral and independent decision to outsource ecommerce website management"), 24 (claiming that Fanatics' conduct "ha[s] nothing to do with the NFL"). *See also* Fanatics Mot. at 8–9 (describing alleged conspiracy as "unilateral" conduct by NFLP with which Fanatics complied, as well as "presumptively lawful" licensing agreements), 10 ("NFLP can decide to whom it will license its IP and set the terms of its own distribution policies"), 13

Simply put, that's not how it works. In *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962), the Supreme Court reversed as "improper" a Ninth Circuit opinion that treated complex antitrust conspiracy claims "as if they were five completely separate and unrelated lawsuits." *Id*. at 698–99. The Court held that "[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Id*. at 699; *accord Duke Energy Carolinas LLC v. NTE Carolinas II LLC*, 111 F.4th 337, 355 (4th Cir. 2024) (rejecting piecemeal or siloed approach to antitrust claims); 2 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* § 310c1 at 229 (4th ed. 2014) ("[I]t would clearly be improper for the court to examine each agreement with the same defendant separately, conclude that the agreement standing alone is insufficient to establish illegality, and dismiss the complaint without considering the impact of the aggregation"). Instead, "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." *Continental Ore*, 370 U.S. at 699.

As applied here, this principle requires the Court to examine the overall shape of Defendants' conspiracy, not to take Defendants at their word that scrutiny is unnecessary because licensing agreements, authorized retailer policies, or trademarks can be unproblematic in other contexts.

## III.    Plaintiff Stated a Monopolization Claim.

Plaintiff has also adequately alleged the elements necessary to establish a Sherman Act monopolization claim. Those elements are: "(1) that the [antitrust] defendant has engaged in

---

(stating that "presumptively lawful supply agreements… do not support viable antitrust claims"), 20 (describing scheme as revolving around "NFLP's and certain clubs' choices to have Fanatics handle certain portions of their distribution or retail business")

predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *LEGO A/S v. ZURU, Inc.*, No. 3:18-cv-2045, 2020 WL 13145135, at *3 (D. Conn. Apr. 22, 2020) (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)). As with a restraint of trade claim, "[i]t is common for plaintiffs pleading monopolization claims to 'rely on indirect proof,' such as market share, to prove monopoly power" given the difficulty of obtaining direct evidence at this early stage of the litigation. *Enhanced US LLC v. World Aquatics*, No. 25-cv-7096, 2025 WL 3206662, at *12 (S.D.N.Y. Nov. 17, 2025) (quoting *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 227 (2d Cir. 2006)).

**Predatory or Anticompetitive Conduct.** As set forth in detail above, Plaintiff alleges extensive predatory and anticompetitive conduct. *See supra* Section I. The Complaint describes a four-pronged scheme consisting of (1) a group boycott of retailers who sold NFL Licensed Products through TPOMs; (2) exclusive dealing arrangements designed to deny competitors access to manufacturers and suppliers; (3) anticompetitive domain-name licensing agreements through which horizontal competitors effectively withdrew from competition and ceded the market to Fanatics; and (4) keyword advertising restrictions that rendered competitors' offerings "effectively invisible to online consumers." Compl. ¶¶ 103–107, 175–185. Each of these practices independently constitutes anticompetitive conduct, and together they form a coordinated scheme designed to eliminate competition in the online retail market for NFL Licensed Products.

**Specific Intent to Monopolize.** The Complaint amply pleads that Defendants acted with the specific intent to monopolize the relevant market. Specific intent may be derived from the Defendants' words or from their conduct. *See Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 101 (2d Cir. 1998). Indeed, this inference may be drawn from conduct that constitutes an unreasonable restraint of trade in violation of Section 1. *P & L Dev.*, 715 F. Supp. 3d at 465.

In this case, Plaintiff provides direct evidence of anticompetitive intent through Michael Rubin's own admissions. Rubin stated that if NFL Licensed Products were commonly available through other retailers, "there'd be no reason for [Fanatics] to be," and that "[i]f your strategy is just to win on price, you're eventually going to die." Compl. ¶¶ 10–11. Rubin has also been candid about the financial benefits Defendants reap from their arrangement. Regarding the NFL's stake in Fanatics, Rubin explained: "They get a cut of everything we sell. So the more we sell, the more money they/we make and I can tell you, the growth we've seen in both the NFL and MLB in this partnership has been, I think in a lot of ways better than anyone expected." *Id*. ¶ 244. Rubin has boasted that "[t]he Leagues and Teams make a lot more money in this business than they used to make under the old model." *Id.* ¶ 229. And Rubin has publicly admitted that, given the relatively fixed size of the market for licensed sports products, Fanatics' business strategy is not to grow the overall market but to increase its "share of the closet"—that is, to take market share from other retailers. *Id.* ¶ 210.

Their conduct tells the same story. The complaint alleges that Defendants' purpose in enforcing the No TPOM Sellers, No Online Retailers, and No NFL Keywords Policies was specifically "to drive Defendants' competitors from the online market for NFL Licensed Products"—a goal evidenced by selective enforcement against competitors while exempting Fanatics and other favored parties from the same policies. *Id.* ¶¶ 204–206. The complaint further alleges that Defendants concealed their conspiracy through confidentiality provisions and made "fraudulent statements to create the false appearance of competition." *Id.* ¶¶ 316–317. Such conduct supports a strong inference of specific intent to monopolize.

**Dangerous Probability of Achieving Monopoly Power.** The Complaint alleges that Defendants collectively "dominate the online retail market for NFL Licensed Products" and have

"possessed and exercised the power to profitably increase prices and restrict output in the market through their control of licensees and online retail domains." Compl. ¶ 294. Since 2017, Fanatics' share of the online market for NFL Licensed Products "has been over 50%"—a figure that is "sufficient to infer market power in the relevant market." *Id.* ¶¶ 300–301. When combined with the NFL Defendants' additional market share, Defendants "control the vast majority of the online market for NFL Licensed Products." *Id.* ¶ 301.

This market power is not theoretical. Defendants "demonstrated their actual market power by prohibiting licensees from selling to retailers operating on TPOMs and thus competing with Defendants' own retail operations." *Id.* ¶ 302. The Complaint further alleges that Defendants used this power "to restrain not only licensees' future sales but also the ultimate retail sale of NFL Licensed Products that licensees had already sold to distributors and retailers without these restrictions." *Id.* As Rubin himself acknowledged, the conspiracy has allowed Defendants to charge supracompetitive prices, with "[t]he Leagues and Teams mak[ing] a lot more money in this business than they used to make under the old model." *Id.* ¶ 220. These allegations establish both existing market power and a dangerous probability of achieving complete monopolization.

Furthermore, the anticompetitive conduct alleged has created substantial barriers to entry that further enhance Defendants' dangerous probability of achieving monopoly power. Through their control over licensees, domain names, and NFL-related keywords, Defendants have made it exceedingly difficult for new competitors to enter the online retail market for NFL Licensed Products. The No NFL Keywords Policy, for example, is "self-concealing as the operation of the policy means that consumers cannot acquire knowledge that competing retailers are even offering NFL Licensed Products for sale." *Id.* ¶ 318. This entrenches Defendants' position and forecloses meaningful competitive entry. And, their efforts were successful: Fanatics has pushed competitors

34

out of the market and the Defendants have reaped supercompetitive profits.

**IV.    There Are No Grounds to Strike Plaintiff's Class Allegations at this Stage.**

**A.    The NFL Defendants' request is premature.**

The NFL Defendants ask the Court to strike Plaintiff's class allegations on the basis that *some* unnamed class members *may* be subject to arbitration. While motions to strike are generally disfavored, the NFL Defendants' "motion to strike class allegations is '*even more* disfavored because it requires a reviewing court to preemptively terminate the class aspects of . . . litigation, solely on the basis of what is alleged in the complaint, and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled'" on questions relevant to class certification. *Goetz v. Ainsworth Pet Nutrition, LLC*, 768 F. Supp. 3d 645, 651 (S.D.N.Y. 2025) (emphasis added) (quoting *Chenensky v. New York Life Ins. Co.*, 2011 WL 1795305, at *1 (S.D.N.Y. Apr. 27, 2011)). For that reason, "motions to strike class allegations are often denied as premature." *Reynolds v. Lifewatch, Inc.*, 136 F. Supp. 3d 503, 511 (S.D.N.Y. 2015).

To prevail on a motion to strike class allegations "before taking discovery, 'a defendant must demonstrate from the face of the complaint that it would be impossible to certify the alleged class regardless of the facts the plaintiffs may be able to obtain during discovery.'" *Goetz*, 768 F. Supp. 3d at 651 (quoting *Id.*). The NFL Defendants have not, and cannot, demonstrate that there are no facts that Plaintiff would be able to uncover in discovery that would preclude this Court from certifying the class. Instead, the NFL Defendants argue a point of law that they will have an opportunity to present—after discovery and factual development—in response to Plaintiff's motion for class certification.

Further, courts in this District have consistently declined to strike class allegations at the motion to dismiss stage, including when arbitrability affects some unnamed class members,

preferring to defer such determinations until class certification proceedings, when a fuller factual

record exists. *See, e.g., Collins v. Pearson Educ., Inc.*, 721 F. Supp. 3d 274, 289–90 (S.D.N.Y.

2024) (denying motion to strike class allegations based on arbitration agreements at the pleading

stage as premature); *Mayfield v. Asta Funding, Inc.*, 95 F. Supp. 3d 685, 696 (S.D.N.Y. 2015)

(denying motion to strike as premature because defendants had not yet proven that plaintiffs had

"waived their class action rights and established a 'meeting of the minds on all essential terms' of

any such waiver" and because "the mere possibility of individualized defenses will not preclude

certification of a class where common questions of law or fact predominate"); *Sullivan v.

Study.com LLC*, No. 18-cv-1939, 2019 WL 1299966, at *6–7 (S.D.N.Y. Mar. 21, 2019) (denying

motion to strike as premature because the issue whether class members "entered into arbitration

agreements that included class-action waivers" mirrored "the class certification inquiry" which

should be decided at the class certification stage and because the plaintiff "is not alleged to have

himself signed an arbitration agreement, nor [was] there any evidence . . . with respect to how

many other putative class members" signed arbitration agreements); *Rothstein v. Auto Club S.*,

2017 WL 11455316, at *4 (S.D.N.Y. Mar. 16, 2017), *R. & R. adopted*, 2017 WL 1373914

(S.D.N.Y. Apr. 13, 2017) (denying motion to strike allegations based on mandatory arbitration

clause as premature because defendants' argument was premised "on factual and legal disputes to

be decided at a later point in the litigation").

While Defendants identify two cases in which motions to strike class allegations were

granted prior to the class certification stage, each involved circumstances different than those at

issue here. In the first case, *In re Ry. Indus. Emp. No-Poach Antitrust Litigation*, the court struck

class allegations on the ground that the named plaintiffs in a no-poach wage suppression case failed

to satisfy "their burden to set forth factual allegations to advance a prima facie showing of

predominance or that at least it is likely that discovery will reveal evidence that antitrust impact may be proven on a class-wide basis for all employees." 395 F. Supp. 3d 464, 514 (W.D. Pa. 2019). And in the second case, *Thomas v. AAM Holding Corporation*, the court struck class allegations because the named plaintiff conceded she waived her right to pursue class action claims in a contractual agreement, presenting the "[o]ne circumstance where striking the class allegations may be appropriate, [namely], where a contractual waiver clearly precludes the possibility that a plaintiff's claim may be brought on a class-wide basis." No. 1:24-cv-7253, 2025 WL 2617450, at *3-4 (S.D.N.Y. Aug. 26, 2025).

The cases cited by Defendants are inapposite. As shown in the complaint, common questions of law and fact predominate over any questions affecting only individual members. Compl. ¶¶ 75, 79. Moreover, as this Court aptly noted in *Mayfield*, "even if Defendants can ultimately prove that individual Plaintiffs waived their class action rights, the mere possibility of individualized defenses," like arbitrability, "will not preclude certification of a class where common questions of law or fact predominate over questions affecting individual class members." *Mayfield*, 95 F. Supp. 3d at 696; *see also Collins*, 721 F. Supp. 3d at 290 (denying motion to strike based on class waiver within arbitration provision and noting that "even assuming that some members of the putative class were ineligible to participate, the remedy at this initial stage would almost certainly be to prune, rather than strike, the class allegation."). Even more damning to Defendants' motion is their failure to show that the named Plaintiff, Mr. Franz, agreed to arbitrate and failure to cite a single case granting a motion to strike class action allegations in the absence of such a showing. *See Sullivan*, 2019 WL 1299966 at *7 (denying motion to strike a class action claim as premature where plaintiff "is not alleged to have himself signed [the] agreement").

37

The Court should reject Defendants' premature request to strike Plaintiff's class allegations at this early stage, prior to class certification and without the benefit of a complete record.

**B.    Any modifications to Plaintiff's class definition should be reserved for class certification.**

If, as Defendants argue, the class is overbroad, Plaintiff or the Court may modify the proposed class definition at the class certification stage, after the parties have had the opportunity to determine exactly who should be included or excluded. The determination cannot properly be made until a class certification motion is briefed, with the benefit of class discovery.[4]

Plaintiff does not dispute that some members of the Class, as currently defined, may be subject to arbitration agreements that this Court previously found lawful in *Maldonado v. National Football League*, No. 22-cv-02289, 2023 WL 4580417 (S.D.N.Y. July 18, 2023). Tellingly, however, the Defendants have not moved to compel arbitration in *this* action. There is a reason: the way in which Mr. Franz paid for his transaction (using a third-party payment platform) was insufficient to bind him to arbitration. Defendants know this and, for that reason, have not moved to compel arbitration. Discovery will reveal the exact contours of the class and who else is in Mr. Franz's position as opposed to Mr. Maldonado's position. Accordingly, there is no reason to strike Plaintiff's class allegations at the motion to dismiss stage.

Class definitions are routinely refined during litigation as discovery illuminates the contours of the putative class—including to address the potential presence of some class members who may be subject to arbitration. That is precisely the type of factual question that is appropriately addressed at class certification, where the Court can assess the manageability of the class and, if

---

[4] Plaintiff expressly reserved the right in his Complaint to "revise the class definition based on information learned through discovery." Compl. ¶ 72.

necessary, modify the class definition to exclude individuals bound by enforceable arbitration agreements.

Indeed, courts regularly certify classes with modified definitions that exclude certain individuals, and such refinements are a routine facet of class action practice under Rule 23. *See*, *e.g.*, *Hill v. Xerox Bus. Servs., LLC*, 59 F.4th 457, 474 (9th Cir. 2023) (affirming certification of class in antitrust conspiracy case that excluded signatories of arbitration agreement); *Chen-Oster v. Goldman, Sachs & Co.*, 449 F. Supp. 3d 216, 274 (S.D.N.Y. 2020) (excluding class members who had signed arbitration agreements from certified class); *Eaton v. Ascent Res.-Utica*, LLC, No. 2:19-CV-03412, 2024 WL 1458457, at *7 (S.D. Ohio Apr. 4, 2024) (same, for mineral rights owners "whose leases contain governing arbitration clauses"). Identifying the appropriate contours of the class is one of the principal aims of class discovery—and courts recognize that an antitrust defendant "is in the best position to provide the court with the identities of the potential [ ] class members that have agreed to arbitrate the claims in this lawsuit." *In re Namenda Indirect Purchaser Antitrust Litig.*, 338 F.R.D. 527, 576 (S.D.N.Y. 2021). That is part of class discovery.

For this reason, the Court should defer deciding the contours of the class until class certification.

## CONCLUSION

Plaintiff has adequately alleged antitrust violations committed by the NFL Defendants and Fanatics designed to entrench Fanatics as the dominant provider of online licensed NFL products. Their actions are both *per se* illegal and unreasonable under the rule of reason. Accordingly, the Court should deny Defendants' motions to dismiss in their entirety. If the Court grants any part of either Motion, it should do so without prejudice so that Plaintiff can amend to cure any deficiencies identified by the Court.

Dated:  January 6, 2026                     Respectfully submitted,

                                            **BURNS CHAREST LLP**

                                            */s/ Matthew S. Tripolitsiotis*

Matthew S. Tripolitsiotis
757 Third Ave, 20th Floor
New York, NY 10017
Telephone: (469) 895-5269
mtripolitsiotis@burnscharest.com

Warren T. Burns (*pro hac vice*)
900 Jackson Street, Suite 500
Dallas, TX 75202
Telephone: (469) 904-4550
wburns@burnscharest.com

Claire Bosarge Curwick (*pro hac vice*)
201 Saint Charles Ave Ste 2900
New Orleans, LA 70170
Telephone: (504) 799-2845
ccurwick@burnscharest.com

Ian Baize (*pro hac vice* pending)
2445 M Street NW, Suite 740
Washington, DC 20037
Telephone: (202) 577-3977
ibaize@burnscharest.com